**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

————————————————————————————

**KEITH MANNERS,**

**Plaintiff,**

vs.                                                        **6:14-CV-810**
                                                              **(MAD/TWD)**

**NEW YORK STATE DEPARTMENT**
**OF ENVIRONMENTAL CONSERVATION,**
**JOSEPH SCHNEIDER, WALTER HEINRICH,**
**PAULA LAIME, ANN LAPINSKI, PETER FANELLI,**
**and JAMES McCRUM,**

**Defendants.**

————————————————————————————

**APPEARANCES:**                          **OF COUNSEL:**

**E. STEWART JONES HACKER**        **RYAN M. FINN, ESQ.**
**MURPHY, LLP**
7 Airport Park Boulevard
Latham, New York 12110-0104
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK STATE**    **MICHAEL G. McCARTIN, AAG.**
**ATTORNEY GENERAL**
The Capitol
Albany, New York 12224-0341
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff, Keith Manners, commenced this action pursuant to 42 U.S.C. § 1983 and § 1985,

the Americans with Disabilities Act ("ADA"), and the New York State Human Rights Law

("HRL") against his former employer, the New York State Department of Environmental

Conservation ("DEC"), various DEC employees, and Defendant McCrum with the New York

State Police, on July 3, 2013. *See* Dkt. No. 1. Pending before this Court is Defendants' motion to dismiss. *See* Dkt. No. 9.

## II. BACKGROUND

Plaintiff was employed at the DEC as a police officer in February, 2013. *See* Dkt. No. 1 at ¶ 7. On February 6, 2013, while off duty, Plaintiff was involved in a domestic dispute with the mother of his child. *Id.* at ¶ 16. A New York State Trooper responded to the incident and Plaintiff filed a report stating that he was a victim of domestic violence.[1] *Id.* at ¶¶ 17-19. The following week, Plaintiff followed up with the New York State Police regarding the incident and was informed that his complaint had been assigned to Defendant James McCrum, an Investigator with the New York State Police. *Id.* at ¶ 20. Plaintiff states he made several attempts to contact McCrum to obtain information regarding the status of his complaint "but his requests for information were ignored." *Id.* at ¶ 21. Thereafter, Plaintiff contacted a Senior Investigator and a Captain with the New York State Police in an attempt to obtain information regarding the February 2013 incident. *Id.* at ¶¶ 22-23. Defendant McCrum then contacted Plaintiff and informed him that the incident was a "'he said - she said' matter" and no action could be taken with regard to the complaint filed by Plaintiff. *Id.* at ¶ 24. In response, Plaintiff filed a complaint with the New York State Police regarding McCrum's handling of his complaint. *Id.* at ¶ 25.

After filing the complaint with the New York State Police, Plaintiff states that McCrum went "around to local Police Departments in the area looking for 'dirt' on Plaintiff" and utilized

---

[1] A supporting deposition provides that Plaintiff's child's mother also filed a police report on February 6, 2013, with the New York State Police regarding the incident. *See* Dkt. No. 9-2 at 1. Plaintiff and his child's mother both obtained Orders of Protection stemming from the February 6, 2013, incident against one another.

New York State's E-Justice System to illegally obtain information about Plaintiff. *Id.* at ¶¶ 27-28. Further, Plaintiff states that McCrum contacted Defendant Joseph Schneider, a Major with the DEC Division of Law Enforcement, informing him about the February 6, 2013, incident. *Id.* at ¶ 30.

Plaintiff states in his complaint that Defendant McCrum and the individual DEC Defendants conspired to take adverse action against him in retaliation for the complaint he filed with the New York State Police.[2] *Id.* at ¶ 29. In March 2013, Plaintiff states that Defendant Fanelli revoked Plaintiff's ability to work part-time with the local Sheriff's Department without explanation, which he had done with the DEC's permission for several years. *Id.* at ¶¶ 37-38. In response, Plaintiff filed a grievance with the DEC regarding Fanelli's action. *Id.* at ¶ 41.

On April 24, 2013, the DEC requested that Plaintiff attend an interrogation at DEC headquarters to inquire about the February 6 incident, Plaintiff's use of his patrol vehicle, a recent motor vehicle accident, and Plaintiff's relationship with a fellow DEC employee. *Id.* at ¶¶ 42-43. On June 6, 2013, Defendant Heinrich notified Plaintiff that he would be suspended for six months without pay.[3] *Id.* at ¶ 45.

---

[2] Defendants' motion to dismiss offers a conflicting account of events and states that the DEC issued two Notices of Discipline against Plaintiff in response to improper conduct by Plaintiff and that Plaintiff voluntarily resigned thereafter.

[3] Defendants submitted a copy of the June 6 Notice of Discipline, which states four charges against Plaintiff: "(I) You are charged with misconduct in that you violated the office of public protection (OPP) code of conduct for division of law enforcement employees; (II) You are charged with misconduct for not residing in your sector in zone 7 in region 3 and for filing paperwork with the division that falsely reported your residence location; (III) You are charged with misconduct in that you used your position as environmental conservation officer at DEC to contact a state police commander regarding a private complaint you had about state police officer; and (IV) You are charged with misconduct in that you violated the New York State Environmental Conservation Officer Oath of Office."

Thereafter, Plaintiff took medical leave for aggravation of a pre-existing military disability, which he attributed to the stress and anxiety caused by Defendants' actions. *Id.* at ¶ 48. Plaintiff states that Defendants "spread false information about [P]laintiff to his fellow NYSDEC police officers and coworkers" who then refused to speak to him. *Id.* at ¶ 47. To substantiate his need for medical leave, Plaintiff submitted a doctor's note to Defendants on August 29, 2013. *Id.* at ¶ 49. On September 19, 2013, Defendant Schneider ordered Plaintiff to submit documentation containing a diagnosis from his doctor. *Id.* at ¶ 51. Again, on or about September 27, 2013, Defendant Laime requested Plaintiff submit documentation from his doctor containing a diagnosis to confirm his absence. *Id.* at ¶ 52. According to the complaint, Plaintiff reluctantly divulged his confidential health information to Defendants under threat of further discipline.[4] *Id.* at ¶ 53. Although Plaintiff's doctor submitted documentation releasing him back to work by October 1, 2013, Defendant Laime's September 27 letter stated that before Plaintiff was permitted to return to work, he would need to undergo a medical examination by the Employee Health Service. *Id.* at ¶¶ 55-56. The examination was scheduled for October 23, 2013, and Plaintiff was released back to work on October 30, 2013. *Id.* at ¶ 57. During this month delay, Plaintiff was required to use his accrued benefits and sick leave. *Id.*

Plaintiff states that upon returning to work, he continued to be isolated from his coworkers. *Id.* at ¶ 58. On November 20, 2013, Plaintiff was required to attend an "interrogation" with the DEC. *Id.* at ¶ 59. On December 9, 2013, Plaintiff was suspended without pay and ten days later Plaintiff received his second Notice of Discipline stating that he

---

[4] Defendants dispute this account of events and have submitted correspondence between Defendants and Plaintiff regarding the matter. At the motion to dismiss stage the Court may only consider the facts as Plaintiff alleges within the complaint, subject to limited exceptions not applicable here.

would be terminated. *Id.* at ¶¶ 60-61. Plaintiff resigned on February 6, 2014 "after facing

intolerable work conditions for almost a year." *Id.* at ¶ 69.

In the Complaint, Plaintiff states that throughout 2013 he was repeatedly informed that the

DEC "was going to find a way to terminate him." *Id.* at ¶ 65. The Complaint states that

Defendant Laime stated that NYSDEC was going to fire Plaintiff "one way or another." *Id.* at ¶

66. Further, Defendant Heinrich "made comments that [P]laintiff would have 'plenty of time' to

work at the Sheriff's office after [P]laintiff is suspended." *Id.* at ¶ 67. Finally, Defendant

Lapinski stated, "if [P]laintiff fights the termination and is successful at arbitration, that she

would make a call to her friends in the Inspector General's office and have them follow [P]laintiff

around until they find a reason to terminate [him]." *Id.* at ¶ 68.

In his Complaint, Plaintiff raises four[5] separate causes of action: (1) a First Amendment

retaliation claim against Defendants in their individual capacities[6] brought pursuant to 42 U.S.C.

§§ 1983 and 1985, and Article I, § 9 of the New York State Constitution; (II) a Due Process

constructive discharge claim against Defendants in their individual capacities brought pursuant to

42 U.S.C. §§ 1983 and 1985, and Article I, § 6 of the New York State Constitution; (III)

discrimination based on Plaintiff's disability and status as a victim of domestic violence against

Defendants in their individual capacities brought pursuant to § 296 of the New York State Human

Rights Law ("HRL"); and (IV) discrimination based on Plaintiff's disability against the DEC

brought pursuant to the Americans with Disabilities Act ("ADA"). *See* Dkt. No. 13 at 10.

---

[5] Plaintiff initially filed five causes of action against Defendants but has since withdrawn his third cause of action: deprivation of Plaintiff's liberty interests. *See* Dkt. No. 13 at n.2.

[6] Plaintiff conceded in his opposition to Defendants' motion to dismiss that his first, second, third, and fourth causes of action should be dismissed, without prejudice, against the NYSDEC and the individual Defendants in their *official* capacities. *See* Dkt. No. 13 at n.2.

Defendant's motion to dismiss seeks dismissal of the action in its entirety. *See* Dkt. No. 9-9 at 4.

## III. DISCUSSION

**A.      Standard of Review under Fed. R. Civ. P. 12(b)(1) and (6)**

When a party moves to dismiss a claim pursuant to Rule 12(b)(1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted).  For purposes of such a motion, "the allegations in the complaint are not controlling . . . and only uncontroverted factual allegations are accepted as true. . . ." *Id.* (internal citations omitted).  Both the movant and the pleader are permitted to use affidavits and other pleading materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).  "Furthermore, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'" *Gunst v. Seaga*, No. 05 Civ. 2626, 2007 WL 1032265, *2 (S.D.N.Y. Mar. 30, 2007) (quoting *Shipping Financial Services Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)); *see also State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007) (holding that, in a motion to dismiss for lack of subject matter jurisdiction, a court "may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits").

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id.* at 570.

**B.      42 U.S.C. § 1983**

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976) (quoting 42 U.S.C. § 1983).  Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained.  *See Brown v. Coughlin*, 758 F. Supp. 876, 881 (S.D.N.Y. 1991) (citing *Martinez v. California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481, *reh. denied*, 445 U.S. 920, 100 S. Ct. 1285, 63 L. Ed. 2d 606 (1980)).  As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions.  *See id.* (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)) (other citation omitted).

**C.      Conspiracy under 42 U.S.C. § 1983**

"'To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.'" *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, *18 (N.D.N.Y. Oct. 21, 2009) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right.  *See Malsh v. Austin,* 901 F. Supp. 757, 763-64 (S.D.N.Y. 1995) (citation omitted).  Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights.  *See id.*; *see also Friends of Falun Gong v. Pacific Cultural Enterprise, Inc.*, 288 F.

Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted).

To withstand a motion to dismiss, the conspiracy claim must contain more than "'conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights[.]'" *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (quotation omitted); *Shabazz v. Pico*, 994 F. Supp. 460, 467 (S.D.N.Y. 1998) (holding that a mere allegation of conspiracy with no facts to support it cannot withstand a motion to dismiss). Specifically, the plaintiff must provide some factual basis supporting a "meeting of the minds," such as that the defendants "entered into an agreement, express or tacit, to achieve the unlawful end[;]" the plaintiff must also provide "some 'details of time and place and the alleged effects of the conspiracy.'" *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir .1993)).

In the present matter, the Court will address the alleged conspiracy claims while addressing the merits of the underlying causes of action.

**D.      Plaintiff's 42 U.S.C. § 1985 Claims**

Section 1985 allows an injured party to recover damages, "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, [the injured party] of the equal protection of the laws, or of equal privileges . . . of the laws." 42 U.S.C. § 1985(3) (2013). To recover pursuant to Section 1985(3), a plaintiff must demonstrate that there was:

> (1) a conspiracy; (2) for the purpose of depriving a person . . . of the equal protection of the laws, or the equal privileges and immunities of the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.

*Morpugo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 339 (E.D.N.Y. 2010) (citing *Thomas v.*

*Roach*, 165 F. 3d 137, 146 (2d Cir. 1999)). "A conspiracy is an agreement between two or more individuals, where one individual acts in furtherance of the objective of the conspiracy, and each member has knowledge of the nature and scope of the agreement." *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 337 (S.D.N.Y. 1999) (citation omitted). There must be a "'meeting of the minds, such that defendants entered into an agreement . . . to achieve the unlawful end.'" *Id.* (citing *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003)). Furthermore, a plaintiff must demonstrate that the "conspiracy was motivated by 'some racial, or perhaps otherwise class-based'" factors. *Mian v. Donaldson, Lufkin, & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1999) (citing *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)). "[C]onclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 (2d Cir. 1999) (citing *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983)).

Here, Plaintiff never states that the alleged conspiracy was motivated by race or other class-based factors. *See Griffin v. Breckenridge*, 403 U.S. 89, 102 (1971) (holding that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action"). Therefore, Plaintiff's § 1985 conspiracy claim fails as a matter of law.

## E.  Claims Against the DEC and the Individuals in their Official Capacities

Plaintiff's first, second, and fourth causes of action allege claims against the DEC and the individual Defendants in their individual and official capacities. *See* Dkt. No. 1 at ¶ 75. Defendants argue that Plaintiff's claims against Defendants in their official capacities should be dismissed as they violate the Eleventh Amendment. *See* Dkt. No. 9-9 at 8-9.

The Eleventh Amendment provides a state with sovereign immunity from suit. *See Virginia Office for Protection and Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (citation

omitted). "[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." *Id.* at 1638 (citation omitted). Generally, New York and its agencies enjoy sovereign immunity from suit in federal court under the Eleventh Amendment. *See Woods v. Rondout Valley Central Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (holding that the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities) (citation omitted).

Plaintiff has conceded that these claims should be dismissed against the DEC and the individual Defendants in their official capacities. *See* Dkt. No. 13 at 13. Accordingly, Plaintiff's first, second, and fourth causes of action are dismissed against the DEC and the Defendants in their official capacities as barred by the Eleventh Amendment.[7]

## F. First Amendment Retaliation

"[T]he Second Circuit has 'described the elements of a First Amendment retaliation claim in several ways, depending on the factual context.'" *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, *22 (E.D.N.Y. Aug. 21, 2008) (quoting *Williams v. Town of Greenburgh*, [535 F.3d 71, 76 (2d Cir. 2008)]). Thus, there are two different standards to be applied to reflect Plaintiff's status as a *private citizen* alleging retaliation for a complaint lodged against the New York State Police and his status as a *public employee* lodging complaints against his public employer's alleged retaliatory actions.

### 1. Speech as a Private Citizen

_____

[7] Plaintiff's voluntary dismissal of claims against the DEC and the individual Defendants in their official capacities alleviates the need to consider the Rule 12(b)(1) claim in Defendant's motion to dismiss.

11

Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted). For plaintiffs not seeking action against their public employer, the speech "need not have been on a matter of public concern for it to fall within the protection of the First Amendment." *Williams*, 535 F. 3d at 77.

In cases "involving criticism of public officials by private citizens," the Second Circuit has "impose[d] an actual chill requirement for First Amendment retaliation claims[,]" *i.e.*, a requirement that the plaintiff allege and ultimately prove an "actual chill" of his First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)); *see also Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (holding that the "plaintiff must show, with respect to the third element, that his First Amendment rights were 'actually chilled'"). To establish this element, it is not enough for the plaintiff simply to show that he changed his behavior in some way; he must show that the defendant intended to, and did, prevent or deter him from exercising his rights under the First Amendment. *See, e.g., Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2d Cir. 1996) (holding that, to establish a First Amendment retaliation claim, the plaintiffs must show that the defendants acted "with the purpose of deterring the exercise of First Amendment freedoms"); *Wolff v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, *6 (S.D.N.Y. Apr. 27, 2009) (holding that, "[i]n order to maintain a First

Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)).

Here, Plaintiff's complaint alleges that Defendant McCrum retaliated against him for filing a grievance following a personal domestic dispute between Plaintiff and the mother of his child. *See* Dkt. No. 1 at ¶¶ 30, 32. Plaintiff filed his complaint against Defendant McCrum with the New York State Police, who was not his public employer. As such, contrary to Defendants' contentions, Plaintiff's First Amendment retaliation claim against Defendant McCrum is not subject to the requirement that the speech be on a matter of "public concern." *See* Dkt. No. 9-9 at 13.

Defendants further argue that under the "private citizen" standard, Plaintiff's claim against Defendant McCrum fails as McCrum's "actions" do not meet the legal standard required to constitute a violation of Plaintiff's First Amendment rights. *See* Dkt. No. 14 at 6-7. In support of their position, Defendants cite *Zherka v. Amicone*, where the court held that retaliation in the form of "speech against speech[,]" absent any quantifiable loss, does not constitute an adverse action. *See Zherka v. Amicone*, 634 F.3d 642, 646-47 (2d Cir. 2011); *see* Dkt. No. 14 at 6-7. The Court agrees. Moreover, Plaintiff's alleged protected activity, filing a complaint against Defendant McCrum regarding the way his investigation was handled, occurred in April of 2013. *See* Dkt. No. 9-3 at 4. Nearly all of Defendant McCrum's alleged retaliatory conduct occurred immediately following the February 5, 2013 domestic violence incident. *See* Dkt. No. 1 at ¶¶ 16-30. For example, Plaintiff alleges that Defendant McCrum sent a fax to Defendant Schneider regarding the domestic incident on February 20, 2013. *See id.* at ¶ 30. Clearly, Defendant McCrum's alleged retaliatory actions could not have been motivated by protected conduct that had not yet

occurred.

To the extent that Plaintiff alleges that Defendant McCrum investigated him for illegitimate reasons after he filed his complaint with the New York State Police, the Court finds that the complaint fails to plausibly allege that this conduct effectively chilled the exercise of his First Amendment rights. *See Wolff*, 2009 WL 1468691, at *6 (holding that, "[i]n order to maintain a First Amendment retaliation claim, a private citizen complainant must allege that the defendant took some action in response to his or her First Amendment activity that 'effectively chilled the exercise of his First Amendment right'" (quoting *Williams*, 535 F.3d at 76)); *Lacey v. Yates County*, 30 F. Supp. 3d 213, 229 (W.D.N.Y. 2014) (dismissing the plaintiff's First Amendment retaliation claim where the plaintiff alleges in an entirely conclusory fashion that his "'rights to oppose governmental action have been severely chilled'" as a result of the investigator's alleged misconduct); *Dorsett v. County of Nassau*, No. 11–CV–5748, 2013 WL 272796, *4 (E.D.N.Y. Jan. 24, 2013) (dismissing First Amendment claim because the "plaintiffs ... failed to allege, other than in conclusory fashion, that defendants' conduct chilled the prospective exercise of their First Amendment rights"). In fact, in his complaint, Plaintiff contends that he "continued to protest the manner in which he was treated yet the retaliation only escalated[.]" Dkt. No. 1 at ¶ 83.

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's First Amendment retaliation claim against Defendant McCrum.

### 2. Speech as a Public Employee

To establish a retaliation claim under Section 1983 in violation of a public employee's First Amendment rights, a plaintiff must show that: "(1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists

between the speech and the adverse employment action." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). In determining whether a plaintiff's speech was constitutionally protected, the court must determine "whether [he] spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted). This requires two separate determinations: "(1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 291 (E.D.N.Y. 2009) (citing *Sousa*, 578 F.3d at 170). "If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law." *Id.*

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999). Speech relates to a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Griffin v. City of N.Y.*, 880 F. Supp. 2d 384, 401 (E.D.N.Y. 2012) (citations omitted).

Defendants allege that "Plaintiff's personal complaints about unfair work practices did not constitute matters of public concern." *See* Dkt. No. 9-9 at 13. In support, Defendants cite *Lane v. Bonin*, 772 F. Supp. 2d 678 (W.D. Pa. 2011). In that case, the court found that

> the Plaintiff's "free speech" at issue had to do with his involvement in three internal investigations of police conduct, one in which he was named and served as a witness, one of which he filed, and one of which was filed against him; however, that alleged conduct did not rise to the level of criminal behavior, . . . nor was the Plaintiff attempting to illuminate alleged wrongdoing on the part of employees of the [Pennsylvania State Police] as a matter of public concern, or a general policy issue to be addressed; rather, the Plaintiff in the instant case was concerned with how the alleged behavior affected himself personally.

*Lane v. Bonin*, 772 F. Supp. 2d 678, 686-87 (W.D. Pa. 2011). As such, the court held that the

15

plaintiff's speech "does not rise to the level of constitutionally protected First Amendment speech, and any alleged retaliation for that speech does not implicate constitutional concerns." *Id.* at 687.

Considering the allegations in Plaintiff's complaint, it is clear that Plaintiff's grievances – both with the New York State Police and with his employer – did not seek to address anything more than *his* own treatment and did not touch upon issues of "political, social, or other concern to the community." *Griffin*, 880 F. Supp. 2d at 401; *see* Dkt. No. 1. As such, Plaintiff did not engage in speech protected by the First Amendment; and, therefore, the Court grants Defendants' motion to dismiss as to Plaintiff's First Amendment retaliation cause of action regarding the claims against the DEC employees.


**G.      Constructive Discharge**

"Constructive discharge is considered an adverse employment action sufficient to support a retaliation claim." *Dall*, 966 F. Supp. 2d at 194. "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry*, 336 F.3d at 151-52 (citing *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)). Constructive discharge "requires a 'further showing' beyond what is necessary to establish a hostile work environment or retaliation claim, such that resignation qualified as a fitting response." *Bundschuh*, 914 F. Supp. 2d at 408 (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004)).

"Because the standard for constructive discharge requires a determination of how a reasonable person would behave 'in the employee's shoes,' *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983), 'the issue of whether a constructive discharge has occurred should generally be left to the trier of fact.'" *Halbrook v. Reichhold Chems., Inc.*, 735 F. Supp. 121, 125

(S.D.N.Y. 1990).  "[W]orking conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'"  *Terry*, 336 F.3d at 152 (quoting *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)).  "An employee need not show that an employer acted with the specific intent to cause the employee to resign; rather, she need only show that the employer's actions were 'deliberate and not merely negligent or ineffective.'"  *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 310 (N.D.N.Y. 2013) (quoting *Petrosino*, 385 F.3d at 229–30); *see also Farren*, 852 F. Supp. 2d at 362 ("If a plaintiff cannot show specific intent on the part of the employer, he or she is required to at least demonstrate that an employer[']s actions were deliberate, not merely negligent or ineffective").

### 1. The DEC Defendants

In support of their position, Defendants rely on two cases which held that "when an employee resigns rather than respond to disciplinary charges, the resignation cannot later be construed as a constructive discharge."  *Bailey v. New York City Bd. of Educ.*, 536 F. Supp. 2d 259, 266 n.9 (E.D.N.Y. 2007); *Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002).  While the Court generally accepts this principle, the cases provided are distinguishable.  First, in both cases, the pending motions were for summary judgment as opposed to a motion to dismiss.  The constructive discharge analysis is a fact intensive inquiry more appropriately addressed at the summary judgment stage.  Moreover, unlike the cases upon which Defendants rely, Plaintiff has alleged facts suggesting that any attempt to challenge his pending termination would have been futile.  *See* Dkt. No. 1 at ¶¶ 66-68.  For example, Plaintiff has alleged that Defendant Lapinski informed him that if he "fights the termination and is successful

at arbitration, that she would make a call to her friends at the Inspector General's office and have them follow plaintiff around until they find a reason to terminate [him]." *Id.* at ¶ 68. Moreover, according to the complaint, "Plaintiff filed multiple grievances in an effort to address and stop the improper action and abuse of power[.]" *Id.* at ¶ 64. Although Plaintiff did resign without attending an arbitration hearing, he *did* avail himself of multiple meetings and filed multiple grievance reports before concluding "that the harassment, retaliation and mistreatment would never end." *See* Dkt. No. 1 at ¶¶ 41, 42, 59, 64, 69.

Accepting as true all of the well-pleaded facts, the Court finds that Plaintiff has plausibly alleged a constructive discharge claim against the DEC Defendants; and, therefore, Defendants' motion to dismiss is denied as to this claim.

### 2. Defendant McCrum

To the extent that Plaintiff is attempting to allege that Defendant McCrum conspired with the DEC Defendants as to his alleged constructive discharge, the claim must be dismissed. Plaintiff fails to plausibly allege that Defendant McCrum entered into an agreement with the DEC Defendants to deprive Plaintiff of a constitutional right. Plaintiff's conclusory allegations to the contrary are insufficient to survive the pending motion.

Based on the foregoing, the Court grants Defendants' motion to dismiss as to Plaintiff's constructive discharge claim as it relates to Defendant McCrum.

### H.     § 296 of the New York State Human Rights Law

Discrimination claims brought under the ADA and HRL are evaluated using the same analytical framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-03

(1973).  *See Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012).  Under this framework, a

plaintiff alleging discrimination in violation of the HRL must plausibly plead the following: (1)

that the defendant is subject to the HRL; (2) that the plaintiff is disabled within the meaning of

the statute; (3) that the defendant was aware of the plaintiff's disability; (4) that the plaintiff could

perform the essential functions of the job with or without reasonable accommodation; and (5) that

the plaintiff was subject to an adverse employment action because of her disability.  *See*

*Montesano v. Westgate Nursing Home, Inc.*, 956 F. Supp. 2d 417, 422 (W.D.N.Y. 2013)

(*Rambacher v. Bemus Point Cent. Sch. Dist.*, 307 Fed. Appx. 541, 543-44 (2d Cir. 2009);

*Shannon v. New York City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)).

The ADA defines "disability" as: "A) a physical or mental impairment that substantially

limits one or more of the major life activities of [an] individual; B) a record of such an

impairment; or C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  The

HRL defines "disability" somewhat more broadly as "a physical, mental or medical impairment

resulting from anatomical, physiological, genetic or neurological conditions which prevents the

exercise of a normal bodily function or is demonstrable by medically accepted clinical or

laboratory diagnostic techniques[.]"  N.Y. Exec. Law § 292(21).  Thus, the HRL "provides that

disabilities are not limited to physical or mental impairments, but may also include 'medical'

impairments," and, in addition, "unlike the ADA, the NYSHRL does not impose the requirement

that the impairment substantially limit the individual's normal activities."  *Penberg v. Health*

*Bridge Mgmt.*, 823 F. Supp. 2d 166, 182 (E.D.N.Y. 2011) (internal quotation marks omitted).

Additionally, the HRL makes it unlawful for an employer "because of an individual's . . .

disability . . . or domestic violence victim status, to refuse to hire or employ or to bar or to

discharge from employment such individual or to discriminate against such individual in

compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296-1(a).

"Aside from the law's unique definition of 'disability,'" however, claims under the HRL are

analyzed under the same burden-shifting framework as ADA claims. *See id.* (citation omitted).

In the present matter, Plaintiff alleges that, "[u]nder an enormous amount of stress and

anxiety, [P]laintiff went out on medical leave, as his pre-existing military disability had been

aggravated from the stress and anxiety placed upon him by defendants." Dkt. No. 1 at ¶ 48.

Plaintiff submitted a doctor's note on August 29, 2013 to substantiate the need for medical leave.

*See id.* at ¶ 49. Plaintiff claims that "NYSDEC refused to accept the doctor's note. Instead,

NYSDEC demanded more information about [P]laintiff's protected and confidential health

information." *Id.* at ¶ 50. Moreover, Plaintiff claims that "[d]espite repeated protestations from

[P]laintiff and his physician, [D]efendant Schneider, on or about September 19, 2013, issued a

direct order to [P]laintiff to disclose his confidential medical information, and to have his doctor

include a diagnosis on the out of work slip." *Id.* at ¶ 51. Plaintiff further claims that, on

September 27, 2013, Defendant Laime again wrongfully requested that Plaintiff provide a doctor's

note with a specific diagnosis from his physician. *See id.* at ¶ 52. Plaintiff asserts that, under

threat of further discipline, he "reluctantly agreed to divulge his confidential and protected health

information to his employer." *Id.* at ¶ 53.

Plaintiff claims that he was released back to work by his physician on October 1, 2013,

but the DEC refused to accept the documentation submitted by his doctor. *See id.* at ¶ 55.

Instead, Plaintiff claims that Defendant Laime ordered Plaintiff to attend "an unnecessary medical

examination," which the DEC had no legitimate reason to require. *See id.* at ¶ 56. The

examination was scheduled for October 23, 2013 and Plaintiff was finally released to return to

work on October 30, 2013. *See id.* at ¶ 57. During this one-month delay, Plaintiff was required to

use his accrued sick leave and benefits. *See id.*

In their motion to dismiss, Defendants contend that "'an employer is allowed to require that an employee's request for leave be supported by certification from a health care provider." Dkt. No. 9-9 at 21 (quoting *Murphy v. Cadillac Rubber & Plastics*, 946 F. Supp. 1108, 1122 (W.D.N.Y. 1996)). As such, Defendants contend that being asked to produce additional medical paperwork, even if the request was unreasonable, does not constitute an "adverse employment action" under the ADA. *See id.* (quoting *Tayag v. Lahey Clinic Hosp., Inc.*, 677 F. Supp. 2d 446, 453 (D. Mass. 2010)). Further, Defendants assert that, as to Plaintiff's claim that he was subjected to an unnecessary medical examination, "district courts within the Second Circuit have been clear that both 'the EEOC and case law' indicate that 'testing ordered by the employer that physically or *mentally* tests an employee's ability to perform his or her job are permissible tests under the ADA." *Id.* at 22 (quoting *Medline v. Rome Strip Steel Co.*, 294 F. Supp. 2d 279, 293 (N.D.N.Y. 2003)). Similarly, Defendants contend that, pursuant to Civil Service Law § 72, an employer is permitted to require an employee to undergo a medical examination if the employer believes that the employee is unable to perform the duties of his or her position by reason of a disability, without violating the ADA. *See id.*

Although the Court generally agrees with the contentions raised in Defendants' motion, the Court finds that the cases relied upon are distinguishable. For example, the cases upon which Defendants rely were disposed of at the summary judgment stage, not through a motion to dismiss. *See, e.g., Medlin v. Rome Strip Steel Co., Inc.*, 294 F. Supp. 2d 279, 292-93 (N.D.N.Y. 2003) (denying the defendant's motion for summary judgment, but finding that the undisputed facts established that the required examination was properly limited to determining whether the plaintiff could safely return to his previous position without any restrictions); *Pellegrino v.*

*County of Orange*, 313 F. Supp. 2d 303, 318 (S.D.N.Y. 2004) (granting the defendant's motion for summary judgment and noting that the plaintiff failed to show that she was treated differently from any other similarly situated individuals who had taken extended periods of pregnancy/sick leave).

Additionally, the Court finds that Plaintiff plausibly alleged an adverse employment action. Defendants correctly assert that solely requiring an examination pursuant to Civil Service Law § 72 would be insufficient to create an inference of discrimination. However, as noted in *O'Toole v. Ulster County*, "[p]laintiff does not argue that the § 72 examination by itself constitutes materially adverse action; rather, the § 72 examination, followed by involuntary, unpaid leave, establish materially adverse action." *O'Toole v. Ulster County*, No. 1:12-CV-1228, 2014 WL 4900776, *10 (N.D.N.Y. Sept. 30, 2014). Here, Plaintiff was required to undergo an exam prior to returning to work, which required he utilize his sick leave and benefits from October 1, 2013 until October 30, 2013, when he was permitted by Defendants to return to work. *See* Dkt. No. 1 at ¶¶ 55-57. Therefore, consistent with *Baum*, the § 72 examination, combined with Plaintiff's substantial loss of sick time, state a claim that is more "than a mere inconvenience. . . .". *O'Toole*, 2014 WL 4900776, at *10.

Based on the foregoing, the Court denies Defendants' motion to dismiss Plaintiff's HRL discrimination claims.[8]

### 1. HRL Aid and Abet

---

[8] In their reply memorandum of law, Defendants argue that the Court should dismiss Plaintiff's HRL claim premised upon his status as a domestic violence victim "once all of the federal claims are dismissed." Dkt. No. 14 at 12. Since the Court has not dismissed all of Plaintiff's federal claims and because Defendants failed to address the substance of Plaintiff's claim, the Court denies this aspect of Defendants' motion.

Further, Defendants argue that Plaintiff's HRL claim against Defendant McCrum fails as he was not Plaintiff's employer. *See* Dkt. No. 9-9 at 23. While an individual employee is not ordinarily subject to suit under the HRL, "[u]nder the aiding and abetting provision of NYHRL, an individual employee who actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Miotto v. Yonkers Pub. Sch.*, 534 F. Supp. 2d 422, 427 (S.D.N.Y. 2008); *see also* N.Y. Exec. Law § 296(6) (McKinney 2013) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article"). Individuals may be held liable if they "actually participate[ ] in the conduct giving rise to a discrimination claim." *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314-15 (2d Cir. 1995) (citations omitted). It is also "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the acts forbidden . . . or to attempt to do so." N.Y. Exec. Law § 296(6) (McKinney 2000). This, again, requires that "the defendant actually participated in the conduct giving rise to the claim of discrimination", and that the "aider and abetter 'share the intent or purpose of the principal actor.'" *Robles v. Goddard Riverside Cmty. Ctr.*, No. 08 Civ. 4856, 2009 WL 1704627, *3 (S.D.N.Y. June 17, 2009) (citations omitted).

In the present matter, the Court finds that Plaintiff has failed to plausibly allege that Defendant McCrum shared the intent or purpose of Plaintiff's employer. In an entirely conclusory fashion, Plaintiff alleges that on February 20, 2013, Defendant McCrum sent Defendant Schneider a fax "concerning the domestic incident in an effort to cause problems with [P]laintiff's job." Dkt. No. 1 at ¶ 30. As discussed above, Plaintiff had not yet filed his complaint with the State Police regarding Defendant McCrum's investigation of the domestic incident. Plaintiff provides no other rationale as to why Defendant McCrum was allegedly conspiring against him or why he would aid the DEC Defendants in the alleged constructive discharge. Plaintiff's

conclusory allegations regarding Defendant McCrum are simply insufficient to support this cause of action against Defendant McCrum.

Based on the foregoing, the Court grants Defendants' motion to dismiss Plaintiff's HRL aid and abet cause of action against Defendant McCrum.

## I. Discrimination in Violation of the ADA

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112 (2009). States and their agencies, however, are immune against these claims. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Gorton v. Gettel*, 554 F.3d 60, 62 (2d Cir. 2009) ("As a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment Immunity") (citation omitted). The Eleventh Amendment ensures that "nonconsenting States may not be sued by private individuals in federal court." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000).

A state's immunity may be abrogated, however, when Congress "both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (quotation omitted). It is well established that "the Eleventh Amendment bars private suits seeking money damages for state violations of Title I of the ADA." *Tennessee v. Lane*, 541 U.S. 509, 514 (2004) (citation omitted). In addition, employees cannot be sued under the ADA because "there is no individual liability under Title I . . . of the ADA." *See Perciballi v. New York*, No. 09 Civ. 6933, 2010 WL 3958731, *4 (S.D.N.Y. Sept. 28, 2010) (citation omitted). Further, suits against individuals in their official capacities are

"deemed to be [ ] suit[s] against the state, and the official[s] [are] entitled to invoke the Eleventh Amendment belonging to the state." *Id.* (citing *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993)).

Plaintiff claims that the DEC Defendants "wrongfully requir[ed] [P]laintiff to disclose his confidential medical information[]" and "wrongfully harassed [P]laintiff and subjected him to disparate treatment requiring an unnecessary medical examination[]" in violation of the ADA. *See* Dkt. No. 1 at ¶¶ 140-41. Plaintiff cites *Conroy v. N.Y. State Dep't of Corr. Servs.*, in which the plaintiffs challenged a DOCS Sick Leave Directive that required "an employee bring medical certification upon returning to work after an absence." *Conroy*, 333 F.3d at 92. There, the Second Circuit held that an employer's practice of "requiring a general diagnosis is sufficient to trigger the protections of the ADA" and that "[t]he ADA creates an exception to generally prohibited inquiries when 'such . . . inquiry is shown to be job-related and consistent with business necessity." *Id.* at 95, 97 (internal citations omitted).

Unlike the plaintiffs in *Conroy*, Plaintiff's claim is brought pursuant to Title I of the ADA and seeks money damages, not injunctive relief. Since Congress did not validly abrogate state sovereign immunity from suit brought pursuant to Title I of the ADA, the DEC, as a New York State agency, is immune from Plaintiff's ADA claim seeking monetary damages.[9] *See Marino v. City University of New York*, 18 F. Supp. 3d 320, 331 (E.D.N.Y. 2014) (noting that, in *Bd. of Trustees of Univ. of Alabama v. Garrett*, the Supreme Court held that states are immune from damage suits brought under Title I of the ADA); *Lee v. Dep't of Children & Families*, 939 F.

---

[9] Although this issue was not raised in Defendants' motion to dismiss, the Court may address "the issue of sovereign immunity '*sua sponte* because it affects . . . subject matter jurisdiction.'" *Martinez v. Queens Cty. Dist. Att'y*, 596 Fed. Appx. 10, 12 (2d Cir. 2015) (quotation omitted).

Supp. 2d 160, 165-66 (D. Conn. 2013) (citations omitted). Based on the foregoing, the Court grants Defendants' motion to dismiss in regard to Plaintiff's ADA claim.

**J.      Intra-corporate conspiracy doctrine**

The intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg*, No. 10 Civ. 2224, 2012 WL 4017789, *30 (S.D.N.Y. Sept. 13, 2012); *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 603-04 (S.D.N.Y. 2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "'posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.'" *Jefferson v. Rose*, 869 F. Supp. 2d 312, 317-18 (E.D.N.Y. 2012) (quotation omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2*, 798 F. Supp. 2d 443, 461 (E.D.N.Y. 2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2011) (citation omitted); *see also Michael v. County of Nassau*, No. 09-cv-5200, 2010 WL 3237143, *5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

In the present matter, the Court has dismissed all claims against Defendant McCrum. Therefore, to the extent that Plaintiff is attempting to assert conspiracy claims against the remaining Defendants, who are all employed by the DEC, the claims are subject to dismissal pursuant to the intra-corporate conspiracy doctrine.

**K.      Absolute Immunity**

Defendants allege that they are entitled to absolute immunity regarding the prosecutorial decision to issue NODs against Plaintiff. *See* Dkt. No. 9-9 at 23-24. It is well settled that prosecutors enjoy absolute immunity from suit under 42 U.S.C. § 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to § 1983 for their alleged malicious or selective prosecution, as well as for any misconduct in the presentation of evidence to the Grand Jury).

Defendants specifically argue that "agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts[.]" *Butz v. Economou*, 438 U.S. 478, 515 (1978). Specifically, Defendants state that Defendant Lapinski should be immune from suit as she served in a "prosecutor-like position as DEC's attorney." *See* Dkt. No. 9-9 at 24. However, according to Plaintiff's complaint, Defendant Lapinski stated that "if [P]laintiff fights the termination and is successful at arbitration, that she would make a call to her friends in the Inspector General's office and have them follow [P]laintiff around until they find a reason to terminate [him]." Dkt. No. 1 at ¶ 68. Moreover, the allegations in the complaint plausibly suggest that Defendant Lapinski was engaged in investigative functions that fall outside the protection of absolute prosecutorial immunity. *See Bernard v. Cnty. of Suffolk*, 356 F.3d 502-03 (2d Cir. 2004). At this stage in the litigation, considering the facts as presented in Plaintiff's complaint, Defendants' claim of absolute immunity fails.

**L.      Qualified Immunity**

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit").  "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants.  *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider in either order.  *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted).  The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations omitted).  The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Second Circuit has made clear that it disfavors granting qualified immunity at the motion to dismiss stage.  *See McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983) (noting that generally "the defense of qualified

immunity cannot support the grant of a [Rule] 12(b)(6) motion for failure to state a claim upon which relief can be granted").

In regard to Defendant McCrum's actions, Defendants cite *McIntyre v. Skolnik*, No. 3:09-cv-581, 2011 WL 1304482 (D. Nev. Apr. 1, 2011). In *McIntyre*, the plaintiff was assaulted outside of his residence and the defendant, a deputy sheriff, responded to the scene. *See id.* at *1. While at the scene, the plaintiff complained that the defendant was not taking the incident seriously and that he showed favoritism to the perpetrator. *See id.* The following day, the defendant contacted an unidentified person at the Nevada Department of Corrections, where the plaintiff worked, and reported that the plaintiff "had been uncooperative, belligerent, and had falsified his statement." *Id.* The plaintiff was subsequently fired, which he blamed on the defendant's report to his employer. *See id.* Finding that the defendant was entitled to qualified immunity as to the First Amendment retaliation claim, the court held as follows: "There is no case law directly on point or making it clear that reporting Plaintiff's conduct at the scene to his employer would constitute a First Amendment violation under these circumstances. At most the question is close; too close to hold [the defendant] liable for a First Amendment violation." *Id.* at *4.

The Court agrees with Defendants that Defendant McCrum is entitled to qualified immunity as to Plaintiff's claims brought pursuant to 42 U.S.C. § 1983. The Court has been unable to find any case law directly on point making it clear that Defendant McCrum's conduct would constitute a First Amendment violation under the circumstances of this case. Plaintiff does not allege that Defendant McCrum transmitted false information when he faxed Defendant Schneider on February 20, 2013. Rather, the complaint indicates that Defendant McCrum simply informed Defendant Schneider that Plaintiff was involved in a domestic incident on February 5,

2013.  *See Dansby v. Borough of Paulsboro*, No. 92-Civ.-4558, 1995 WL 352995, *14 n.12 (noting "that public policy favors law enforcement agencies promptly receiving information regarding the arrest of their employees" and that "it is customary for a police department to notify the employer upon the arrest of a law enforcement official").

Based on the foregoing, the Court finds that, in the alternative, Defendant McCrum is entitled to qualified immunity.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss of Plaintiff's First Amendment Retaliation claim is **GRANTED** in part and **DENIED** in part;[10] and the Court further

**ORDERS** that all claims against Defendant McCrum are **DISMISSED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 14, 2015
        Albany, New York

**Mae A. D'Agostino**
**U.S. District Judge**

---

[10] As a result of this Memorandum-Decision and Order, the only remaining claims are Plaintiff's constructive discharge and HRL claims against the DEC Defendants.